**John M. MURPHY, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**No. 85 Civ. 676.**

United States District Court, E.D. New York.

Nov. 7, 1985.

Felix T. Gilroy, Staten Island, N.Y., for petitioner.

Edward A. McDonald, U.S. Dept. of Justice, Organized Crime Strike Force, E.D. of N.Y., Brooklyn, N.Y., for respondent; Norman A. Bloch, Sp. Atty., New York City, of counsel.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

John M. Murphy was convicted in 1981 of conspiracy, 18 U.S.C. § 371, and of acceptance of an unlawful gratuity, 18 U.S.C. § 201(g). These convictions were upheld on appeal to the United States Court of Appeals for the Second Circuit. *United States v. Myers*, 692 F.2d 823 (2d Cir. 1982).[1] The Supreme Court subsequently denied a petition for a writ of certiorari. *Murphy v. United States*, 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983). Murphy now moves to set aside his convictions pursuant to 28 U.S.C. § 2255.[2] Because Murphy's moving papers do not reveal any constitutional violation, this motion will be denied.

Murphy's convictions arose out of the criminal investigation known as Abscam. That investigation has been upheld against a due process challenge, 692 F.2d at 843–47, and is not the subject of this motion.

---

**1.** The Second Circuit reversed a third conviction for violating the conflict of interest statute, 18 U.S.C. § 203(a)(2). 692 F.2d at 853–58.

**2.** 28 U.S.C. § 2255 provides in pertinent part:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion for such relief may be made at any time.

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

Instead, Murphy makes a series of claims alleging prejudice stemming from two incidents during his trial before (then District) Judge George C. Pratt. Those incidents will be addressed in turn.

## I.

The first incident, the passing of a cup of water from a government agent on the witness stand to a juror in the jury box was considered fully by Judge Pratt in denying a defense motion for a mistrial. While Judge Pratt and the prosecution and defense attorneys were engaged in a sidebar conference, spectators, including Murphy's wife and son, observed FBI Agent Anthony Amoroso pouring a cup of water and handing it to a juror. When the jury had left the courtroom, one of Murphy's trial attorneys, Michael E. Tigar, brought the incident to Judge Pratt's attention and moved simultaneously for a mistrial. Judge Pratt asked for Agent Amoroso's version of the events:

> The Court: Would you tell me exactly what happened, Mr. Amoroso, please.
>
> Agent Amoroso: Yes, your Honor. The lady at the far end asked me if she could have a glass of water for the gentleman sitting at her left. I poured the glass and handed it to her and she handed it to him.
>
> The Court: Did you say anything to her?
>
> Agent Amoroso: No.
>
> The Court: You simply poured a glass of water and gave it?
>
> Agent Amoroso: Yes. And gave it to her and she handed it to him.

Tr. 1144. Pressing his motion for a mistrial, Attorney Tigar stated: "[W]e disagree with Agent Amoroso's characterization of the conversation. It is my information that he initiated the contact." Tr. 1146. Tigar revealed the source of his information as Murphy's wife, who then testified:

> The Court: Mrs. Murphy, would you just tell us in your own words what you saw?
>
> The Witness: I was watching Agent Amoroso. And he was sitting here panting as though he had had a lot to say and his mouth was tired and his voice was tired. And he kept looking at the jurors and going (indicating). And, excuse me, that is what he was doing. And as he did this they were watching him and some exchange went on between them. I couldn't of course hear what it was. And then he looked at them and handed them the water.
>
> The Court: Was it one cup of water or more than one cup?
>
> The Witness: I did not see him give two.
>
> The Court: Did you see what juror drank the water?
>
> The Witness: The second one.
>
> The Court: No. 2?
>
> The Witness: The man.

Tr. 1149. Because by this time it was late in the day on Friday, the court adjourned until Monday morning.

On Monday, Tigar renewed his motion for a mistrial, arguing that the water-passing incident was a prosecutorial impropriety designed to avoid an acquittal.[3] Tigar explained:

> [O]n Friday, we did cross examine all day and the cross examination was directed at questions of credibility. We are dealing with an agent who served sixteen years in Government. I can't believe the conduct was unintentional or inadvertent. It was designed to curry favor with the jury.

Tr. 1157. However, he expressly disclaimed any desire to disqualify one or more of the jurors: "Specifically, we are not asking that any jurors be removed because we went through great pain to select this jury and we are pleased with them."

---

3. Tigar quoted from *United States v. Jorn*, 400 U.S. 470, 485 n. 12, 91 S.Ct. 547, 557 n. 12, 27 L.Ed.2d 543 (1971): "Conversely, where a defendant's mistrial motion is necessitated by judicial or prosecutorial impropriety designed to avoid an acquittal, reprosecution might well be barred."

Tr. 1155. It was then decided that Judge Pratt would question the jurors, one by one, in chambers, to determine "whether what happened would in any way affect the[ir] approach to the case [or] their evaluation of Mr. Amoroso's credibility in the case." Tr. 1159–60. Murphy, through his attorney, waived his right to be present. Tr. 1159.

Having interviewed each of the jurors and alternates in the presence of a court reporter, Tr. 1161–85, Judge Pratt denied the motion for a mistrial:

> I would find that there were no gestures by Mr. Amoroso toward the jury, that there was no attempt on the part of Mr. Amoroso to curry favor with the jury, that his response to the statement by Mr. Prout that it would be nice if he had a cup of water was prompted by feelings of altruism rather than a desire to take advantage of an opportunity to score some pluses in the minds of the jury. I would further find that the event has had no significant impact upon the jury or any member of it and that none of them would, in any way, be influenced in their evaluation of the facts by what has occurred.

Tr. 1187.

Murphy's present motion is based on an affidavit obtained by his attorney from Ms. Anne Mullen, Juror No. 1 at Murphy's trial. In pertinent part that affidavit declares as follows:

> THAT during a lull in the testimony of one of the Government's key witnesses, whom your deponent now believes was F.B.I. AGENT AMOROSO, your deponent was asked to pass a cup of water by the Agent to a fellow juror.
>
> THAT at that time, your deponent attached no significance to this act.

THAT, however, on the evening of the following day, your deponent received two telephone calls from relatives who had read about the incident in the local press.

> THAT they each, respectively, advised your deponent that while the jury had been excused from the courtroom, Defendant's JOHN MURPHY, wife had created "a fuss."
>
> THAT at that time, your deponent did report this incident to presiding judge as your deponent attached no significance to the calls at the time they occurred.

From this affidavit, Murphy sets forth a series of arguments as to why his conviction should be overturned or, at a minimum, he is entitled to an evidentiary hearing. Each of these arguments lacks merit.

■ In seeking to relitigate the prejudicial effect of the water-passing incident, Murphy is faced with a heavy burden:

> Where, as here, the incident was explored before submission to the jury, the trial judge's initial appraisal of the ability of the jurors to render a fair verdict in light of the objective facts should stand unless it is manifestly unreasonable ... or significant new objective facts are developed.

*Miller v. United States,* 403 F.2d 77, 84 n. 11 (2d Cir.1968). Murphy makes no claim, and nothing in the record indicates that Judge Pratt's "initial appraisal" was unreasonable. Therefore, Murphy's only relief is available on a showing of "significant new objective facts" that would cast doubt on Judge Pratt's ruling. Here, the only "new fact" that could possibly be relied upon is Ms. Mullen's statement that she received telephone calls from relatives relating to the incident.[4] However, those calls are simply not significant enough to raise a

---

**4.** With regard to the details of the incident itself, Ms. Mullen's affidavit presents no significant conflict with either Judge Pratt's findings, *see* page 564 *supra,* or with her own in-chambers testimony:

> The Court: Don't be nervous. I just have to make some inquiry. At the end of the session on Friday, I am told something happened about a cup of water. Do you recall that?
> Juror No. 1: Yes.

> The Court: Would you tell me what you recall happening?
> Juror No. 1: Well, as much as I can put together, Juror No. 2 said to me he was having trouble with his throat. He said: "I wish I had some water." We were sitting so close to the witness stand, I would say the witness heard him say that and poured a glass of water and handed it to me and I handed it to him.

question about Judge Pratt's determination.

First, those calls have no bearing at all on Judge Pratt's finding that the incident was *not* an attempt by the prosecution to "curry favor" with the jury, the sole ground urged by the defense in moving for a mistrial. Even assuming that those calls were received, they reveal nothing about the motivation of the prosecution or of Agent Amoroso.

 Second, those calls do not undermine Judge Pratt's conclusion that the incident had "no significant impact" on the impartiality of the jury. According to Ms. Mullen's affidavit, the calls told her only that the incident had been reported in the press, and that it had caused concern within the defense camp.[5] That the incident was deemed newsworthy by the press is certainly not prejudicial in itself. Nor can any prejudice be inferred from the description of Mrs. Murphy having made "a fuss" about the incident. Judge Pratt adequately cautioned the jury that although the incident had been taken seriously by all parties, neither it, nor his questioning about it, should be accorded undue significance.[6] As to Ms. Mullen in particular, her colloquy with Judge Pratt amply supports the conclusion that her ability to serve as a juror was not affected. *See* note 564 *supra.* That colloquy, which occurred on the Monday following the weekend in which

The Court: That is what happened?
Juror No. 1: That is the whole story.
The Court: Did the witness, Mr. Amoroso, did he say anything to you?
Juror No. 1: Not a word.
The Court: Did you say anything to him?
Juror No. 1: Not a word.
The Court: You just assumed he had heard?
Juror No. 1: I said to him, a glass of water, with that the witness had poured water.
The Court: For himself?
Juror No. 1: Right. He said he wanted some water. He handed it to me and I handed it to him. The reason I handed it is because he would have to get out of the jury box. It was more convenient.
The Court: It seemed like a normal thing to do?
Juror No. 1: It did seem so at the time.
The Court: Did you see Mr. Amoroso making any gestures or motions towards the jury in any way?
Juror No. 1: No. The only thing I saw him do was pour the water and hand it to me.
The Court: Is there anything in what happened that would affect your approach to this case?
Juror No. 1: No, sir. That to me seemed like the thing to do. I gather it was wrong, I'm sorry. It didn't dawn on me it was wrong.
The Court: Don't worry about it in any way. I should have made clear to the jury at the beginning if they needed a glass of water they should indicate it to me or to the Clerk.
Juror No. 1: Now I know that.
The Court: The witness happens to be very close to the jury box. Will anything that happened affect the way in which you will evaluate Mr. Amoroso's credibility as a witness?
Juror No. 1: It didn't have anything to do with it.

The Court: Thank you. Bill will escort you back to the jury room.
Tr. 1161–63.

5. Attached to Murphy's moving papers is a copy of an article from the New York Daily News that refers to the water-passing incident. Because Ms. Mullen's affidavit does not state that she read any newspaper article, much less the one enclosed, the contents of this article need not be considered. Indeed, the one detail recited by Ms. Mullen, that Mrs. Murphy created "a fuss," does not even appear in the enclosed article.

6. The Court: Good morning again, ladies and gentlemen.
First off, to finish up what I began in chambers with you, I am sure you all understand that whenever anything occurs involving any kind of contact with any jurors, with any participants in the case, whether it be the attorneys or the parties or witnesses, it is a matter of potential problem in the case. As a matter of fact, most of the incidents of this type that do occur after we get through the questioning process that we have gone through turn out to be the result of innocent, well-intentioned, perhaps unthinking, as on the part of people and there is nothing improper whatsoever.
I have questioned each of you and said that is precisely what is the situation here.
I would instruct you to attach no significance for purposes of the case to the fact that the incident that I mentioned to you did occur, nor should you attach any particular significance to the fact that I have questioned you about it. I am simply doing my duty and seeing that the trial—every aspect of it is a fair trial.
So, at this point, just put the whole thing out of your minds.
Tr. 1188–89.

the calls are said to have been received, stands for itself whether or not those calls were actually received.

■■■ The decision to conduct an evidentiary hearing on a § 2255 motion is discretionary. *Newfield v. United States*, 565 F.2d 203, 207 (2d Cir.1977).[7] Because I have found that proof of the statements made in Ms. Mullen's affidavit would warrant no change in Judge Pratt's determinations, no purpose would be served by holding such a hearing.[8] In addition, even if Ms. Mullen were to testify about the telephone calls, she would be barred by Fed.R. Evid. 606(b)[9] from giving any testimony as to their effect on her or on the deliberations of the jury. *See, e.g., Owen v. Duckworth.* 727 F.2d 643 (7th Cir.1984). *Cf. Miller v. United States*, 403 F.2d 77, 83 n. 11 (2d Cir.1968) ("Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror.").

In view of the foregoing, Murphy's motion to vacate his convictions on this ground must be denied.

## II.

Murphy's second argument for a new trial is based on the assertion that prosecutor Thomas Puccio and Judge Pratt reacted with surprise (specifically, prosecutor Puccio jumped out of his chair) when it was revealed that Murphy would not testify in his own behalf. This argument is deficient both factually and legally.

As a factual matter, the record in this case contradicts Murphy's assertion:

The Court: Before we begin with the defendant Murphy, why don't we take a short recess.

Mr. Tigar: If your Honor please, Representative John M. Murphy rests.

The Court: All right, then we'll take a short recess, ladies and gentlemen. Don't discuss this case among yourselves. I want to talk to counsel.

■■■ (Whereupon, the jury left the courtroom). Tr. 2600–01. Moreover, Ms. Mullen's affidavit provides no factual support. Her affidavit avers that "during deliberations the jury discussed Defendant MURPHY not taking the stand, and that he probably did so because he was afraid of being caught in a lie." This statement is, of course, inadmissible under Fed.R.Evid. 606(b). *See* note 9 *supra.* Even if it were admissible, it provides no inference that either Judge Pratt or prosecutor Puccio

---

**7.** *United States v. Moten,* 582 F.2d 654 (2d Cir. 1978), relied on by Murphy, is not to the contrary. In that decision, the Second Circuit, while quoting with approval the language cited by this court from *Miller v. United States,* 403 F.2d 77 (2d Cir.1968), *see* page 564 *supra,* found that the defendant had been denied the opportunity to develop "significant new objective facts." The defendant sought, and was granted, disclosure of *in camera* examinations of two jurors, disclosure of grand jury materials, and permission to interview jurors. None of these restrictions were imposed on Murphy: Judge Pratt's examination of the jurors during trial was on the record, he placed no restrictions on interviewing jurors after trial, and no grand jury materials are involved.

**8.** Murphy argues that a constitutional violation should be found if it is proved that Ms. Mullen received calls *and* communicated this information to Judge Pratt *ex parte.* However, in view of my conclusion that the calls were not prejudicial, and in view of the fact that Murphy had waived his right to be present at the judge's

interview of Ms. Mullen, any violation of this sort would certainly fall within the realm of harmless error. *Cf. Rushen v. Spain,* 464 U.S. 114 (1983) (per curiam).

**9.** Fed.R.Evid. 606(b) reads:

(b) *Inquiry into validity of verdict or indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

acted wrongfully. The only evidence of wrongfulness submitted by Murphy is an unattested transcription of a conversation between Ms. Mullen, Murphy's attorney, and a private investigator in his employ. In that conversation, Ms. Mullen is claimed to have said, after some prodding, "I could tell they were surprised." Such a "frail and ambiguous showing," *King v. United States*, 576 F.2d 432, 438 (2d Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978), is wholly insufficient as a basis for further inquiry into the truth of Murphy's assertion.

▌ Whatever the truth of Murphy's allegations, his argument is legally insufficient in any case:

> In order to reverse a conviction for improper commentary on the right to remain silent, we must find that the comment was "manifestly intended or [was] of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."

*United States v. Cicale*, 691 F.2d 95, 107 (2d Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983) (quoting *United States v. Araujo*, 539 F.2d 287, 291 (2d Cir.), *cert. denied*, 429 U.S. 983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976)). Murphy has cited no authority for the proposition that a wordless physical reaction can be found to be a comment, improper or otherwise. Even if this proposition is theoretically plausible, it is surely inapplicable to the factual circumstances of this case. If Judge Pratt or prosecutor Puccio did react with surprise, it was in response to an announcement that Murphy was resting his case. This announcement conveyed the information not only that Murphy himself would not testify but also that he would be presenting no witnesses in his behalf. A reaction of surprise, which is inherently ambiguous, to an ambiguous statement can hardly reflect a "manifest intent" to comment on a defendant's failure to testify. Nor would it "naturally or necessarily" be taken as such by the jury. Thus, Murphy's

motion to vacate his convictions on this ground must also be denied.

*Conclusion*

For the reasons stated above, Murphy's motion pursuant to 28 U.S.C. § 2255 is denied in full.