849 F.2d 1474
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Goble Lee NEWSOME, Defendant-Appellant.
 No. 87-6148.
 United States Court of Appeals, Sixth Circuit.
 June 28, 1988.
 
 Before ENGEL, Chief Judge, and DAVID A. NELSON and RYAN, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is an appeal from a district court order denying a motion to dismiss an indictment on double jeopardy grounds. Defendant alleges that in the course of his trial he was forced to move for a mistrial as a result of prosecutorial misconduct. The district court declared a mistrial but refused to bar the United States from placing defendant on trial again. Having concluded that there is no constitutional impediment to retrying defendant, we shall affirm the district court's order.
 
 
 2
 Defendant was indicted on three counts of illegal possession of firearms by a convicted felon. 18 U.S.C. Sec. 1202(a)(1). The indictment grew out of an investigation conducted by the Bureau of Alcohol, Tobacco and Firearms (ATF) and the Louisville Police Department (LPD). The investigators utilized the services of a paid informant named Frank Manning to gather information used by the prosecution.
 
 
 3
 In December of 1986 informant Manning obtained employment as a carpenter at defendant's business establishment, a bistro known as the "Pussycat A-Go-Go Lounge." At various times over a period of three or four weeks Manning engaged defendant in conversations on the subject of firearms. ATF agents and LPD detectives monitored the conversations by radio and attempted to record them with a hand-held tape recorder. Their recording efforts were largely unsuccessful; the tapes, according to the government, are almost wholly inaudible.
 
 
 4
 Defendant bragged to Manning about owning 38 firearms. He said he kept them in different places in order to avoid losing them all should he be caught with a weapon. Defendant showed Manning a Ruger .357 caliber revolver that he kept at the lounge. On the strength of Manning's report on this, search warrants were obtained for defendant's residence and place of business. In the course of searches conducted on January 23, 1985, pursuant to the warrants, the police found four weapons at the residence and one at the lounge. A friend of defendant gave the police five additional weapons that belonged to defendant.
 
 
 5
 Defendant was indicted and arraigned in January of 1987. On January 22, 1987, the district court entered a reciprocal order of discovery providing, among other things, that the government would permit defendant to inspect and copy "[a]ny tape recording made by Government agents of any conversation with the defendant." On January 28, 1987, defendant was provided tapes of conversations recorded on January 9, 1985, and January 14, 1985.
 
 
 6
 On March 9, 1987, defendant advised the district court that he intended to file a motion to suppress. A hearing date was set for March 30, 1987. Defense counsel subsequently asked the Assistant U.S. Attorney in charge of the case whether the government intended to use the tape recordings in its case in chief and whether a conversation held on January 21, 1985, had been recorded. The Assistant U.S. Attorney answered both questions in the negative, and counsel withdrew his motion to suppress. The fact was that the January 21 conversation had been tape recorded.
 
 
 7
 At proceedings held on March 30, 1987, defense counsel requested any exculpatory evidence. The government stated on the record that it did not intend to introduce any tapes in its case in chief and again stated erroneously that as a result of an equipment malfunction no tape was made on January 21, 1985. The government noted that it had possession of a statement that defense might find exculpatory, although the government did not consider it to be so, and agreed to furnish the statement.
 
 
 8
 The government also informed the court and defense counsel that it intended to present a superseding indictment to the grand jury on April 6, 1987. On April 13, 1987, the court and defense counsel learned that no superseding indictment had been presented. Faced with an April 20 trial date, the government dismissed the original indictment. On May 6, 1987, defendant was arraigned on the superseding indictment.
 
 
 9
 The government provided additional discovery, and on some date after March 30, 1987, the government gave defense counsel a largely inaudible tape of the January 21, 1985, conversation.
 
 
 10
 On May 7, 1987, defense counsel objected to the discovery he had received to that point. The government responded that
 
 
 11
 "Everytime [sic] evidence has come to our attention, we have supplied it to [defendant's attorney]....
 
 
 12
 * * *
 
 
 13
 * * *
 
 
 14
 "The discovery in this case was made early. It has been made often. And it has been complied with to the fullest."
 
 
 15
 At a hearing on July 23, 1987, defense counsel made further complaints with regard to discovery, and the government responded that the tapes alluded to by defense counsel were not discoverable under Fed.R.Crim.P. 16 because the government did not intend to rely on them at trial. The government further told the court, "[Defense counsel] has the tapes. We have not violated Brady. He had the tapes well in advance of trial."
 
 
 16
 At some point after the two hearings in which defense counsel complained about the government's failure to provide discovery, an ATF case agent informed the Assistant U.S. Attorney that he had found a tape recording of conversations held on December 28, 1984. Because this tape was also inaudible, the government decided that it was not subject to discovery and unilaterally chose not to inform the court of its existence or to give defense counsel a copy.
 
 
 17
 The case went to trial in September of 1987. At the start of trial, in the course of a discussion related to a document he had not received, defense counsel reiterated his previous complaints concerning discovery and reminded the court that it had not ruled on his motion to dismiss. In response the government stated,
 
 
 18
 "I take issue with [defense counsel's] continuing tirades about discovery. This man was given discovery on the day of arraignment, the bulk of the discovery. When I discovered new evidence, I sent it directly to [defense counsel] just as soon as I received it.
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 I've done everything that I can do, everything that's humanly possible in this case to get [defense counsel] the discovery to which he is entitled at the earliest possible moment. I take issue with [defense counsel's] statements and his continuing tirades over discovery in this case. He has received discovery in a more prompt manner than I would say he has received discovery in any case he's ever tried."
 
 
 22
 After a brief discussion, defense counsel asked the government,
 
 
 23
 "Is there any other discovery that you have because I would like to see everything you have got there?"
 
 The Assistant U.S. Attorney replied:
 
 24
 "You have got everything, Tim."
 
 
 25
 During the proceedings that followed, ATF agent Mike Scanlon admitted that there were additional tape recordings in addition to the four given to defense counsel. The government stated during a bench conference that these tapes had been found after the other four tapes had already been given to defense counsel. The court asked who had made the decision that these tapes contained no Brady material. The Assistant U.S. Attorney answered that he had made the decision. He further explained that the tapes were not discoverable under Rule 16, Fed.R.Crim.P., because they were inaudible. (These statements, however, are inconsistent with the government's position on appeal that the Assistant U.S. Attorney had been unaware of the existence of the additional tapes prior to Scanlon's testimony.)
 
 
 26
 Counsel for the defense moved for a mistrial and renewed his motion to dismiss on account of the alleged discovery violations. The district court subsequently granted defendant's motion for a mistrial, stating that the tapes were discoverable as recorded statements of the defendant. The court, however, found that the government had not deliberately withheld discoverable material.
 
 
 27
 Defendant moved to bar further proceedings as violative of the Double Jeopardy Clause of the Fifth Amendment. On October 7, 1987, the court denied the motion, finding that the government's nondisclosure was prosecutorial error that did not amount to overreaching.
 
 
 28
 Generally, a defendant's motion for mistrial removes any bar to reprosecution on double jeopardy grounds, unless the accused has been "forced" into the decision based on prosecutorial misconduct that was intended to provoke the defense into moving a for mistrial. Oregon v. Kennedy, 456 U.S. 667, 679 (1982). See also United States v. Dinitz, 424 U.S. 600 (1976).
 
 
 29
 Under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, the government has a general obligation to disclose evidence that is favorable to the accused and material to the determination of guilt and punishment. See United States v. Presser, No. 87-3896, slip op. at 13 (April 25, 1988). The government typically makes the final decision as to which information is to be disclosed, unless defense counsel becomes aware that other exculpatory material has been withheld and notifies the court that this has occurred. See Pennsylvania v. Ritchie, 94 L.Ed.2d 40, 59 (1987). In the event the government fails to disclose Brady material, the defendant has a constitutional remedy for the nondisclosure only if he can show a reasonable probability that the omission deprived him of a fair trial. Presser, supra, at 13 (citing United States v. Agurs, 427 U.S. 97, 108 (1976)).
 
 
 30
 The question of whether the tapes actually contained exculpatory material is not before us in the instant case. The issue before us, rather, is whether the government's conduct was calculated to goad defendant into moving for a mistrial. The record shows that the district court expressly ordered the government to provide defendant with "any tape recording made by Government agents of any conversation with the defendant." Despite the clarity of this order, the government chose unilaterally to withhold certain tapes from discovery, rationalizing its decision on the grounds that the tapes were inaudible and the government did not plan to introduce them at trial.
 
 
 31
 Upon review, we agree with the district court that the government's behavior, while subject to censure, did not constitute a deliberate attempt to force a mistrial. Because, moreover--as the district court found--the defendant was not seriously prejudiced by what happened, we cannot say that the government was guilty of "overreaching." This case is therefore governed by United States v. Jorn, 400 U.S. 470, 485 (1971):
 
 
 32
 "[W]here circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error."
 
 
 33
 AFFIRMED.